IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BAILIE BYE | § | PLAINTIFF |
| | § | |
| | § | |
| v. | § | Civil No. 1:20cv3-HSO-RHWR |
| | § | |
| | § | |
| MGM RESORTS INTERNATIONAL, | § | |
| INC. doing business as | § | |
| Beau Rivage Resort and Casino | § | DEFENDANT |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION [42] FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion [42] for Summary Judgment filed by Defendant MGM Resorts International, Inc., doing business as Beau Rivage Resort and Casino ("Defendant" or the "Beau Rivage").  Plaintiff Bailie Bye ("Plaintiff" or "Bye") has filed a Response [47], and Defendant has filed a Reply [49].  After due consideration of the record, the Motion [42], related pleadings, and relevant legal authority, the Court is of the opinion that Defendant's Motion [42] for Summary Judgment should be granted, and that Plaintiff's claims should be dismissed with prejudice.

## I.  BACKGROUND

### A.  Factual background

### 1.  Plaintiff's employment with the Beau Rivage

Defendant operates a casino and resort facility in Biloxi, Mississippi.  *See* Mitchell Decl. [42-1] at 1 (Declaration of Defendant's Vice-President of Human

Resources Allison Smith Mitchell).  This case arises out of Plaintiff's claims that, while employed with Defendant, she was subjected to pregnancy and sex discrimination, harassment, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII").  *See* Compl. [1-2] at 4-8.  Construing all facts in Plaintiff's favor for purposes of summary judgment, she began working at Defendant's facility as a server at its Terrace Café restaurant in January 2015.  *See* Pl.'s Dep. [42-2] at 44, 61-62.  Terrace Café operates on a 24-hour basis, with approximately eight servers working during the day shift on staggered schedules.  *See* Cobb Decl. [42-6] at 1-2.    When Plaintiff first began her employment at the restaurant, she typically worked the shift from 6:00 a.m. until 2:00 p.m.  *See* Pl.'s Dep. [42-2] at 81.

Plaintiff's first child was born in November 2016, *see id.* at 46, and when she returned from maternity leave in 2017, she began working the 8:00 a.m. until 4:00 p.m. day shift due to childcare issues, *see id.* at 81-82.  Plaintiff testified that, while she was pregnant with her first child, she informed Defendant that she wanted to breast feed her new baby, but after she returned to work, *see id.* at 44, 46, she was forced to stop breast feeding because she "wasn't given pump breaks," *id.* at 44, and was told that she "was taking too long to pump," *id.* at 45.    It is undisputed that Plaintiff did not file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") at that time.  *See id.* at 48-49.

Following the birth of her second child in 2019, Plaintiff returned to work at the Terrace Café in the same server position, working the same shift, performing

2

the same job duties, and receiving the same or a greater level of pay.  *See id.* at 127-
28.  At the time Plaintiff returned to work in 2019, the Collective Bargaining
Agreement between Defendant and the servers' union required servers to take one
30-minute break per shift.  *See* Pl.'s Dep. [42-2] at 100-01.  The servers also were
given the option to take two additional 15-minute breaks, for a total of 60 minutes
of break time per shift, but they were not required to do so.  *See id.*  Plaintiff
explained in her deposition that the Terrace Café utilized a server known as a
"breaker" who would relieve an employee who went on break.  *See id.* at 97.

Plaintiff testified that there were factors that could sometimes arise that
delayed servers' breaks, including staffing, shift changes, issues in the kitchen, the
number of patrons in the restaurant, party size at a table, or customers staying
longer at a table, *see id.* at 108, 121-25, but that "[e]very situation is unique," *id.* at
122.   If there needed to be a transfer of a check from one server to a breaker, this
could create a delay in starting a break because a manager had to become involved.
*See id.* at 122-23.  Also, "if the breaker was finishing the table for the server and the
tip was going to the server that was on break, then a manager would have to be
involved when closing out, running the payment and everything in between."  *Id.* at
123.

Plaintiff acknowledged in her deposition that for purposes of retaining tips it
would be in the server's best interest to delay a break and retain the table, instead
of turning it over to the breaker before the entrée was served.  This was so because
it allowed a server to try to close out as many tickets as possible before being

relieved by a breaker.  *See id.* at 99-100, 125-26.

2.    Plaintiff's return from her second maternity leave

a.    Plaintiff's initial break schedule

Before Plaintiff returned from her second maternity leave in 2019, she sent a

text message to her manager, Sarah Cormier ("Cormier"), inquiring if she could

receive two 30-minutes breaks, instead of one 30-minute and two 15-minute breaks,

in order to pump breast milk.  *See id.* at 115.  Cormier responded, "you'll get your

breaks.  I'm in at 8:00 a.m., so we can talk about it then." *Id.*

When Plaintiff returned to work in March 2019, she spoke with Cormier

about "the best way to try to get [Plaintiff's] breaks in," *id.* at 133, and completed a

lactation break information form requesting two 30- to 40-minute breaks, *see id.* at

128-31.   Plaintiff was approved to take lactation breaks, *see id.* at 136, and received

the door code for a locked lactation room, *see id.* at 133, 173.  According to Plaintiff,

she would typically begin work around 8:00 a.m. and would receive her first break

pursuant to the breaker schedule.  *See id.* at 137.  After the breaker had completed

breaking all the sections in the restaurant, Plaintiff would then get her second

break.  *See id.* at 138-39.

Defendant tracked breaks using a team update sheet, or what Plaintiff

referred to as a breaker time log, which she reviewed during her deposition.  *See id.*

at 142-47.  The log reflected that from March 10, 2019, through May 16, 2019,

Plaintiff either took two 30-minute breaks or one hour-long break each full day she

worked.  *See id.* at 145-69.  Plaintiff did not originally request breaks at a specific

time, *see id.* at 222-23, and she agreed that Defendant had accommodated her requests during this time period, *see id.* at 171.

      b.    Plaintiff's request for accommodation

On May 11, 2019, Plaintiff submitted a request for accommodation seeking two 45-minute breaks at specific times, one at 10:00 a.m. and one at 1:00 p.m., due to her pumping intervals, and access to the private room with proper refrigeration for milk. *See id.* at 171-72, 177-78; Request [42-5] at 25-27. Plaintiff also submitted a medical certification from her physician, which stated that Plaintiff "must be able to pump break milk . . . until breast feeding (pumping milk) is no longer needed." Cert. [42-5] at 29; *see* Pl.'s Dep. [42-2] at 179. According to the physician's certification, "she <u>must</u> be able to pump breast milk twice during her shift in 45 min increments, once at 10:00 am and at 1:00 pm," Cert. [42-5] at 30 (emphasis in original), in order "to prevent her milk build up and to prevent pain for the patient," *id.* at 31. Throughout the month of May, Plaintiff continued to have lactation breaks per her original schedule. *See* Pl.'s Dep. [42-2] at 184-90.

Marie Twiggs ("Twiggs"), who worked in Defendant's human resources department, communicated with Plaintiff about her request to take longer breaks at specific times, and on May 31, 2019, she sent correspondence to Plaintiff's doctor requesting additional information. *See id.* at 181-84; Letter [42-5] at 33. Twiggs asked the physician to clarify "if there is a medical reason for the breaks to be at 10 am and 1 pm," and "what the maximum amount of time in between pumping should be to avoid milk build-up and pain or discomfort?" Letter [42-5] at 33. It is unclear

5

from the record what, if any, response Defendant received from Plaintiff's doctor.

Following discussions between Plaintiff and Twiggs, Defendant offered three options: (1) working the earlier 6:00 a.m. shift, which would permit Plaintiff to break early around 8:00 a.m.; (2) working the breaker schedule for as long as Plaintiff needed to do so in order to be able to take breaks as needed; or (3) breaking once in the morning and once in the afternoon for 45 minutes as close as possible to the times Plaintiff had requested, but not necessarily at those exact times. *See* Pl.'s Dep. [42-2] at 190-94; Ex. [42-5] at 38. Plaintiff did not accept the first option due to day care issues and the length of time between breaks, *see* Pl.'s Dep. [42-2] at 192, and she did not accept the second option because she "would not be making the same amount of money," *id.* at 193. Plaintiff also did not think that the third option was a reasonable one for her because she felt that, if she accepted it, "the times would constantly get pushed further and further." *Id.* at 194.

Eventually, Defendant granted Plaintiff's request for accommodation and sent her a letter to that effect dated June 14, 2019. *See id.* at 195; Letter [42-5] at 39. Defendant afforded Plaintiff two 45-minute breaks. *See* Pl.'s Dep. [42-2] at 195; Letter [42-5] at 39. The first break would start sometime between 10:00 a.m. and 10:30 a.m., and the second would begin between 1:00 p.m. and 1:30 p.m. *See* Pl.'s Dep. [42-2] at 195-96; Letter [42-5] at 39. Defendant's letter informed Plaintiff that "[i]f you would like to request an additional accommodation in the future or modification to your original accommodation, please contact Employee Relations immediately to discuss your options." Letter [42-5] at 39.

Once this new break schedule began, manager Carol Adams ("Adams") would speak with the breaker at the beginning of the shift about ensuring that Plaintiff was receiving her breaks as close as possible to the times Plaintiff had requested. *See* Pl.'s Dep. [42-2] at 217.  At times when the breaker was not ready or able to relieve Plaintiff, one of the managers would allow her to take her break and would watch over Plaintiff's tables until the breaker was available.  *See id.*   At other times, a manager would completely close Plaintiff's section so that she could take her break.  *See id.*   Plaintiff nevertheless testified that she believed that she was being discriminated against because she felt like it was "a never-ending battle to get the breaks at the times that [she] needed it."  *Id.* at 221; *see also id.* at 217-24.[1]

c.      Plaintiff's allegations of harassment

Plaintiff asserts that, towards the end of her employment with Defendant, co-workers on her shift began to harass her.  *See id.* at 224-25.  When asked to describe specific instances of harassment, Plaintiff relayed an incident where there was an early out, or "EO," sheet available for employees wishing to leave work early to sign because the restaurant was slowing down to the point where it could afford to let one server leave early on certain days.  *See id.* at 225.  On one occasion when Plaintiff signed the EO sheet first, she claims that some employees got upset that

[1]  Plaintiff states in her Response to the Motion for Summary Judgment that "Ms. Bye also detailed in her Interrogatory responses some of the harassment she endured.  For instance, her manager Sarah Cormier told Ms. Bye point blank that lactation breaks need to stop because the breaks are too much."  Resp. [47] at 13 (citing Ex. O).  However, that Response was to an interrogatory inquiring about lactation breaks after Plaintiff's first pregnancy, *see* Ex. O at 3-4, which is not relevant here because Plaintiff's claims related to returning to work following maternity leave for her first child will be dismissed based upon her failure to timely exhaust them.

she had signed before a specific server, Kristin. *See id.* at 225-26. The employees allegedly threw the sheet away and made a new one without Plaintiff's name on it. *See id.* at 226. Because "[i]t became a big fuss over who was going to get cut early," manager Lee McCoy ("McCoy") decided that no one would be able to leave early. *Id.*

Plaintiff asserts that other servers harassed her by not wanting to "co-work on the floor" with her, meaning not working in sections next to hers, not assisting with her tables, and not sharing a credenza and computer with her. *See id.* at 227-28, 247-48. Plaintiff also complained about other servers' "verbiage," in that she believed they spoke to her in a negative way and made comments to her, or to others, about Plaintiff needing to take breaks to pump. *See id.* at 230-39, 243-51.

Plaintiff also testified that she believed that her general manager, Cormier, was trying to terminate her. *See id.* at 251. The basis of this belief was that a restaurant hostess, Jennifer Cress, told Plaintiff that another hostess named Lady had informed Cress about a group message among restaurant workers where an unidentified person stated that Cormier "was working on getting rid of [Plaintiff]." *Id.* at 252. In one audio recording Plaintiff has submitted, she can be heard speaking with someone whom she identifies in her Response [47] as Cress. *See* Ex. K (conventionally file audio recording). Cress states on the recording that Lady saw the group message from a telephone number she did not recognize, but Cress herself was not on the group message and did not see it. *See id.*[2]

---

[2] Plaintiff cites additional audio recordings, but it is sometimes difficult to discern what is occurring during them and impossible to tell who is speaking with Plaintiff. *See* Exs. K, N, P, Q, & R. No transcripts of these conversations were provided, and it is unknown when these conversations occurred. Having reviewed the audio recordings, they are otherwise

Plaintiff never saw these purported messages, and her knowledge of the statements by Cress is based on at least third-hand information from an anonymous source. *See id.*; Pl.'s Dep. [42-2] at 251-52. On the audio recording itself, Plaintiff asks Cress to write a statement on the matter, and Cress responds, "I can write something saying that's what I heard, but I don't know how true it is. I don't know who it came from. I don't have a name. I don't know nothing [sic]." Ex. K. Plaintiff agreed during her deposition that she had no other evidence that Cormier had actually made this comment. *See* Pl.'s Dep. [42-2] at 252. Nor did Plaintiff identify what reason Cormier would have had for purportedly "working on getting rid of" her. *Id.*

Plaintiff testified that she complained to human resources about not receiving her breaks and being harassed by the other employees and was directed to write a statement describing what she felt had occurred. *See id.* at 264-65. She "was told that investigations were being done and that nothing came of it." *Id.* According to the Declaration of Allison Smith Mitchell ("Mitchell"), who is Defendant's Vice-President of Human Resources, Plaintiff complained to human resources on or about June 4, 2019, about not receiving breaks and experiencing harassment. *See* Ex. [42-1] at 6. Mitchell avers that human resources immediately investigated, but was unable to substantiate that Plaintiff was being prohibited from taking lactation breaks or that she was being harassed by her co-workers. *See id.*

---

not sufficient to create a material fact question as to any of Plaintiff's claims.

Plaintiff maintained in her deposition that, "[r]ight when [she] was finally starting to actually get pump breaks at the times that [she] needed them, the harassment had gotten overwhelming." Pl.'s Dep. [42-2] at 267. "As pump breaks were getting better, the co-workers were getting worse on me," and "[a]t that point the work environment had gotten to a point where I felt there was no return" with "[t]he stress of being hated every day that I walked into work . . . ." *Id.* at 269. But when asked to give specific examples of any comments or any other conduct to substantiate these claims, Plaintiff said, "I can see it and I can feel it; but to say the exact words without a trigger to pull it, I cannot do that at this moment." *Id.* Plaintiff also referenced one occasion when she had to leave work early to take her child to the hospital, and other workers cheered that she was leaving. *See id.* at 270.

Ultimately, Plaintiff submitted a two-week notice of her resignation on June 28, 2019, *see id.* at 261-62; Ex. [47-19] at 1-2, and her last day of employment was in July 2019, *see* Ex. [42-5] at 4 (employee history).

B.    Procedural background

Plaintiff filed a charge of discrimination with the EEOC on or about May 29, 2019, alleging harassment, sex discrimination upon her return from maternity leave in March 2019 due to being "denied the ability to take needed breaks and use a breast pump," and retaliation. Ex. [1-2] at 9. Plaintiff filed a second charge with the EEOC on or about August 2, 2019, asserting retaliation and that she "was forced to quit [her] job at the Beau Rivage due to them refusing to allow [her] to

10

take breaks to pump breast milk, along with harassment from [her] coworkers." *Id.* at 13.

On September 17, 2019, the EEOC issued Dismissals and Notices of Suit Rights with respect to both charges. *See id.* at 10, 14. Plaintiff filed suit against Defendant in the Circuit Court of Harrison County, Mississippi, Second Judicial District, on November 13, 2019, advancing claims for pregnancy and sex discrimination, harassment, and constructive discharge in violation of Title VII. *See* Compl. [1-2] at 4-8.[3] Defendant removed the case to this Court, invoking federal question jurisdiction. *See* Notice [1] at 1-3.

Defendant now seeks summary judgment on all of Plaintiff's claims. *See* Mot. [42]. Defendant argues that, to the extent any of Plaintiff's claims relate to her return to work in February 2017 following the birth of her first child, these claims are time-barred because Plaintiff did not file her first EEOC charge until May 2019. Def.'s Mem. [43] at 13-14. Defendant further asserts that Plaintiff cannot support her claims for discriminatory failure to accommodate, harassment or hostile work environment, or constructive discharge. *See id.* at 14-24. Plaintiff has filed a Response [47] in opposition to the Motion [42], and Defendant has filed a Reply [49].

---

[3] Although Plaintiff's EEOC charges referenced retaliation, *see* Ex. [1-2] at 9, 13, she did not assert retaliation in her Complaint, nor has she briefed a retaliation claim in opposition to Defendant's request for summary judgment.

## II. DISCUSSION

A.   Relevant legal standards

1.   Summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam) (quotation omitted). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party. *See Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020).

2.   Title VII and the Pregnancy Discrimination Act

Title VII provides that it is an unlawful employment practice

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

12

terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

42 U.S.C. § 2000e-2(a)(1).  The reference to "terms, conditions, or privileges of employment" includes that it is unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment."  *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

> Title VII, as amended by the PDA, 42 U.S.C. § 2000e(k), further states that
>
> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k).  The Fifth Circuit has held that "lactation is a related medical condition of pregnancy for purposes of the PDA," *E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013), and that "discriminating against a woman who is lactating or expressing breast milk violates Title VII and the PDA," *id.* at 430.

B.    <u>Analysis</u>

1.    <u>Plaintiff's claims related to her first child</u>

The Complaint alleges that following the birth of her first child, Plaintiff "experienced extreme difficulties in being allowed time to breast pump while at work," and that "[t]he issues became so bad that Plaintiff had to quit breast feeding and pumping and Plaintiff experienced issues of post-partem [sic] depression."

Compl. [1-2] at 5.  Defendant argues that this claim should be dismissed because Plaintiff did not timely file a charge of discrimination with the EEOC with respect to any claims relating to the birth of her first child.  *See* Mem. [43] at 5, 13-14. Plaintiff did not address the exhaustion issue or any issues related to her first child in her Response [47] to Defendant's Motion for Summary Judgment; therefore, she is deemed to have abandoned any such claims.  *See Smith v. Amedisys Inc.*, 298 F.3d 434, 451 (5th Cir. 2002).

In addition, before seeking judicial relief, Title VII plaintiffs are required to first exhaust their administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the alleged discrimination.  *See Davis v. Fort Bend Cty.*, 893 F.3d 300, 303 (5th Cir. 2018), *aff'd*, 139 S. Ct. 1843 (2019) (citing 42 U.S.C. § 2000e-5(e)(1)).  "To exhaust, a plaintiff must file a timely charge with the EEOC and then receive a notice of the right to sue."  *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 337 (5th Cir. 2021).  Although a plaintiff's failure to exhaust does not constitute a jurisdictional bar, it is "a prudential prerequisite to suit."  *Davis*, 893 F.3d at 305.

Plaintiff had her first child in November 2016, *see* Pl.'s Dep. [42-2] at 46, and returned to work in 2017, *see id.* at 81-82.  Plaintiff acknowledged that she did not file a charge of discrimination with the EEOC at that time, and it is undisputed that she did not file an EEOC charge until May 29, 2019.  *See id.* at 48-49; Ex. [1-2] at 9.  Because Plaintiff did not timely exhaust any claims related to her return to work in 2017 following the birth of her first child, any such claims should be

dismissed. *See Ernst*, 1 F.4th at 339.

2.   <u>Plaintiff's failure-to-accommodate claims related to her second child</u>

Plaintiff maintains that upon her return to work following the birth of her second child in 2019, Defendant did not reasonably accommodate her request for lactation breaks. *See* Compl. [1-2] at 5-7. Defendant argues that Plaintiff cannot establish a claim for discriminatory failure to accommodate. *See* Mem. [43] at 14-18. Plaintiff responds that while "[t]he law requires actual compliance and reasonable lactation break accommodations," Resp. [47] at 1, Defendant made "no real effort to accommodate lactation breaks," *id.* at 19. According to Plaintiff, "Defendant has not presented any evidence to support its contention that the restaurant was actually too busy to accommodate Ms. Bye's breaks on some days but not others." *Id.* at 3.

In substance it appears that Plaintiff is asserting a disparate-treatment claim for failure to accommodate under Title VII, meaning that her "employer intentionally treated a complainant less favorably than employees with the 'complainant's qualifications' but outside the complainant's protected class." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 135 S. Ct. 1338, 1345 (2015) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). A plaintiff can prove disparate treatment either with direct evidence, or with circumstantial evidence under the burden-shifting framework set forth in *McDonnell Douglas*, 411 U.S. 792 (1973). *See id.* Based upon the summary judgment record, Plaintiff has presented no direct evidence of discriminatory intent; therefore, she apparently relies upon

circumstantial evidence to support her failure-to-accommodate claim.

Under Title VII, a plaintiff may make out a prima facie case of disparate treatment based upon circumstantial evidence by showing that: (1) she belonged to the protected class; (2) she sought accommodation; (3) the employer did not accommodate her; and (4) the employer accommodated others "similar in their ability or inability to work." *Id.* at 1354. If a plaintiff makes such a showing, the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on 'legitimate, nondiscriminatory' reasons for denying her accommodation." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer satisfies this burden of production, the burden shifts to the plaintiff to demonstrate that the employer's proffered reasons are in fact a pretext for discrimination. *See id.*

In this case, Plaintiff has not presented sufficient evidence to support either the third or fourth elements of her prima facie case. First, the summary judgment record demonstrates that Defendant did attempt to accommodate Plaintiff, including increasing her two normal 30-minute breaks to 45 minutes each when she requested, in order to provide her more time to pump her breastmilk. *See* Pl.'s Dep. [42-2] at 171-72, 177-78; Request [42-5] at 25-27. While Defendant could not offer Plaintiff two breaks at exactly the times she had requested due to the nature of the restaurant's business and the way it handled server breaks, the record reflects that it offered her three reasonable, alternative options. *See* Pl.'s Dep. [42-2] at 190-94; Ex. [42-5] at 38. This is insufficient to show that Defendant failed to accommodate her.

16

Even if Plaintiff could establish that Defendant failed to accommodate her, she has presented no evidence to support the fourth element of a prima facie case, that Defendant accommodated others "similar in their ability or inability to work." *Young,* 135 S. Ct. at 1354.  At no point has Plaintiff pointed to any competent summary judgment evidence, nor has she even alleged, that Defendant treated any similarly situated server, or any server at all, more favorably by allowing that server to break at specific times.  *See id.*; *see also* Compl. [1-2] at 4-8; Pl.'s Resp. [47].  Plaintiff has simply not argued or presented evidence to support the proposition that any other employee was accommodated with the breaks that she sought.  In sum, there is simply no evidence of a comparator in the record.  Because Plaintiff has not identified any comparators, she has not made out a prima facie case of disparate treatment based upon failure to accommodate, and Defendant's request for summary judgment as to this claim should be granted.  *See id.*; *see also Santos v. Wincor Nixdorf, Inc.*, 778 F. App'x 300, 304 (5th Cir. 2019) (holding that plaintiff did not establish her prima facie case on PDA claim and that summary judgment was properly granted because plaintiff did not present evidence that "a specific comparator or comparators were treated more favorably than [the plaintiff] under nearly identical circumstances").

Even if Plaintiff could support a prima facie case of disparate treatment under Title VII, Defendant has articulated legitimate, nondiscriminatory reasons for not giving her breaks at the exact times she desired.  Defendant increased Plaintiff's breaks to 45 minutes each, but it has presented evidence that permitting

her to take those breaks at exactly 10:00 a.m. and 1:00 p.m. "would interfere with continuity in service and the fairness and consistency provided with the Breaker schedule." Cobb Decl. [42-6] at 4.  Management also expressed concern that it would be difficult to allow breaks precisely at the specified times because of

> unpredictable circumstances that could impact the ability to break at a specified time, including, staffing levels, increases in guest traffic, variances in the number of tables being serviced during the particular point in the day, variances in the number of tables assigned to the Breaker during the day, and kitchen disruptions.

Mitchell Decl. [42-1] at 5; *see also* Cobb Decl. [42-6] at 4.

Because Defendant has articulated legitimate, nondiscriminatory reasons for its actions, Plaintiff must demonstrate that the proffered reasons "were not its true reasons, but were a pretext for discrimination." *Young*, 135 S. Ct. at 1345 (quotation omitted).  "[T]he plaintiff may reach a jury on this issue by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination." *Id.* at 1354.  Stated another way, "[t]he plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Id.*

Plaintiff has presented no such evidence, nor has she otherwise presented sufficient evidence that casts doubt on Defendant's justification for its actions.  *See*

18

*id.* Plaintiff's mere subjective belief concerning pretext is insufficient to rebut Defendant's reasons, *see Guarino v. Potter*, 102 F. App'x 865, 868-69 (5th Cir. 2004), and summary judgment is warranted for this reason as well.[4]

3.   Plaintiff's hostile work environment claim

Plaintiff alleges "harassment from managers and co-workers because of her need for extra break time to pump at work." Compl. [1-2] at 6.   At the outset, "Title VII does not prohibit all harassment," *Gardner*, 915 F.3d at 325, and "does not set forth a general civility code for the American workplace," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted); *see also Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 676 (5th Cir. 2021).   "[O]rdinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not actionable under a theory of hostile work environment, and the United States Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation omitted).

The Fifth Circuit has similarly held that "allegations of unpleasant work

---

[4]   Plaintiff argues that Defendant did not raise the "business necessity" defense in its Answer and that it presents no evidence of "business necessity." Resp. [47] at 1-2. Defendant did not use this term in its Motion, and "business necessity" is a defense to a Title VII disparate-impact claim, not a disparate-treatment claim. *See* 42 U.S.C. § 2000e-2(k); *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 213 (2010).   Plaintiff has not advanced a disparate-impact claim.   Even if she had asserted such a claim, she has failed to present evidence showing a disparate impact of Defendant's break policies on a protected group under Title VII.   *See Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 839 n.26 (5th Cir. 1999).   This is simply not a disparate-impact case.   *See Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1100 (5th Cir. 1985); *see also, e.g., Huston v. Tennessee State Bd. of Regents*, 83 F.3d 422, 1996 WL 196439, at *3 (6th Cir. 1996) (per curiam).

meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 160 (2020) (quotation omitted).  Title VII is only violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment . . . .'" *Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 617 (5th Cir. 2020) (quoting *Harris*, 510 U.S. at 21).

In order to establish a hostile work environment claim involving co-workers, a plaintiff must show that: (1) she belonged to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on the employee's protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  *See id.*; *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 298 (5th Cir. 2001).  If the employee claims that a supervisor with immediate or successively higher authority harassed her, the employee need only satisfy the first four elements of this test.  *Id.* at 298 n.2 (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)).

Viewing the summary judgment evidence in the light most favorable to Plaintiff, at a minimum the third and fourth elements are problematic for her. Plaintiff has not pointed to any competent summary judgment evidence, other than her own conclusory assertions or subjective beliefs, that tends to show that

20

Defendant's employees' or managers' alleged harassment was related to her lactation breaks. Although Plaintiff did testify in her deposition about some comments that fellow servers made either to her or about her within her hearing about her taking breaks to pump and breastfeeding, no evidence has been submitted as to the frequency of these comments or the identity of the persons making them. *See* Pl.'s Dep. [42-2] at 230-39, 243-51. Nor could Plaintiff identify any of the particular comments any specific person had made. *See id.*

Plaintiff has also not pointed to any competent summary judgment evidence that establishes the fourth element, that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *West v. City of Houston, Texas*, 960 F.3d 736, 741-42 (5th Cir. 2020) (quotation omitted). To be "sufficiently severe or pervasive," the conduct must be both objectively and subjectively offensive. *Badgerow*, 974 F.3d at 617. In determining whether a plaintiff's work environment is objectively offensive, a court must consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.* at 618. "No single factor is determinative." *Id.*

Plaintiff attempts to establish objective offensiveness by stating the following in her Response:

> co-workers would clean out Ms. Bye's credenza, making it impossible for Ms. Bye to work. Jennifer Cress told Ms. Bye that there was group message where a manager was trying to get rid of Ms. Bye. Co-workers cheered and applauded when Ms. Bye had to leave early to take her child

to the hospital.  Another employee – Brett – tried to instigate issues between Ms. Bye and other workers.  Breakers would chose [sic] to break other employees before Ms. Bye, and in some cases would just wait to break Ms. Be [sic] until at least 30 minutes past the designated lactation break time.  In addition, Ms. Bye would be in physical pain because of engorgement, a fact well known to everyone working with Ms. Bye.

To recap, employees openly discussed wanting Ms. Bye to leave or be fired, managers were rude/disrespectful/humiliating, employees would clean out supplies from Ms. Bye's section and refuse to work with Ms. Bye, breakers would choose to break other people and cause Ms. Bye's breaks to be unreasonably delayed, and co-workers applauded and cheered when Ms. Bye had to take her child to the hospital.

Resp. [47] at 19.

Such vague and general allegations do not sufficiently address the frequency of this alleged conduct,[5] nor do they support a finding that the conduct was so severe that it affected a term, condition, or privilege of Plaintiff's employment, or that it was physically threatening or humiliating, as opposed to mere offensive utterances.  *See Badgerow*, 974 F.3d at 618.

In sum, Plaintiff has not demonstrated that she suffered a hostile work environment in violation of Title VII.  The most she has shown is that "her colleagues were sometimes offensive and boorish," which is insufficient.  *West*, 960 F.3d at 743.  Summary judgment is appropriate on this claim.

4.    Plaintiff's constructive discharge claim

Plaintiff next alleges that Defendant constructively discharged her when she was not permitted to take lactation breaks as needed.  *See* Compl. [1-2] at 7.

---

[5] The cases Plaintiff cites in her Response address whether isolated incidents may be sufficient, and her Response refers to a Ms. Coleman and some deputy clerks.  *See* Resp. [47] at 18 n.1.  These statements are not related to the present case.

Defendant argues that summary judgment is appropriate on this claim because Plaintiff's allegations are insufficient to raise a genuine issue of material fact that she was in fact constructively discharged.  *See* Mem. [43] at 21-22.

In determining whether a reasonable employee was constructively discharged because she felt compelled to resign, the Fifth Circuit considers the following events relevant:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status . . . .

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (quotation omitted).

The only factor argued by Plaintiff is the alleged harassment she suffered. *See* Resp. [47] at 17-20.  However, "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim," and "[d]iscrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge . . . ." *Id.*

Plaintiff has not pointed to any evidence of badgering, harassment, or humiliation by Defendant that was calculated to encourage her to resign, *see id.*, and the Court has already determined that the harassment Plaintiff claims she experienced was not sufficiently severe or pervasive to support a hostile work environment claim.  Because Plaintiff cannot support a hostile work environment claim, summary judgment is appropriate on her constructive discharge claim.

5.    Fair Labor Standards Act claim

For the first time in response to Defendant's Motion for Summary Judgment, Plaintiff argues that Defendant violated Section 7 of the Fair Labor Standards Act ("FLSA") by not accommodating her requests for breaks to express breast milk. *See* Resp. [47] at 15-17 (citing 29 U.S.C. § 207(r)(1)(A)).   Defendant objects to this "eleventh hour" attempt to raise an FLSA claim, pointing out that "[t]he law is well settled that a plaintiff may not rely on new claims raised for the first time in a response to a motion for summary judgment."   Reply [49] at 12 (citing *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)).

Where a new claim is raised for the first time in response to a motion for summary judgment, the Fifth Circuit has taken two different approaches: (1) a claim which is not raised in the complaint, but raised only in response to a motion for summary judgment, is treated as not properly before the court; or (2) the district court should treat the new claim as a request for leave to amend.   *See Douglas v. Wells Fargo Bank, N.A.*, 992 F.3d 367, 373 (5th Cir. 2021).   Plaintiff's FLSA claim is not properly before the Court, but even if it should be characterized as a request for leave to amend, such request should be denied.

A scheduling order may only be modified for good cause and with the judge's consent. *See* Fed. R. Civ. P. 16(b)(4).   "Whether good cause exists depends on (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *T.O. v. Fort Bend Indep. Sch.*

*Dist.*, 2 F.4th 407, 418 (5th Cir. 2021) (quotation omitted).  If a plaintiff can demonstrate good cause, then the more liberal standard of Rule 15(a) applies to the request to amend.  *See id.*

Plaintiff's Response was filed over one year after the deadline for amending pleadings.  *See* Order [10] at 4 (setting a June 5, 2020, deadline).  Plaintiff has not offered any explanation for failing to timely move to amend, nor has she explained the importance of the amendment.  *See T.O.*, 2 F.4th at 418.  Plaintiff has never pled damages consistent with those permitted under the FLSA.  *See* Compl. [1-2]; 29 U.S.C. § 216(b) (providing that an employer who violates § 207 is liable to an employee "in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages"); *see also Barbosa v. Boiler House LLC*, No. 5:17-CV-340-DAE, 2018 WL 8545855, at *6 (W.D. Tex. Feb. 23, 2018) (finding on motions to dismiss that plaintiff's claim under § 207(r)(2) failed because she did not plausibly allege compensable damages consistent with the remedies permitted under § 216(b) for "unpaid minimum wages" or "unpaid overtime compensation") (quoting 29 U.S.C. § 216(b)).  Nor has Plaintiff asserted that she suffered any other type of compensable injury under the FLSA.  *See, e.g., McCowan v. City of Philadelphia*, No. CV 19-3326-KSM, 2021 WL 84013, at *17 (E.D. Pa. Jan. 11, 2021) (finding that plaintiff stated a plausible injury under § 207(r) when she was forced to use sick leave to pump).

This matter has been pending for nearly two years, is set for trial in less than

two months, and the deadline for filing dispositive motions has long passed, such that Defendant would be prejudiced if an amendment were permitted at this very late date.  *See T.O.*, 2 F.4th at 418.  A continuance at this point would also be burdensome upon Defendant and the Court, and Plaintiff has not requested a continuance.  *See id.*  Based upon the record, the Court finds no good cause to permit the amendment of Plaintiff's Complaint in opposition to Defendant's summary judgment.  *See* Fed. R. Civ. P. 16(b)(4).  Any purported FLSA claim referenced in Plaintiff's Response to Defendant's Motion for Summary Judgment is not properly before the Court and will not be considered.

### III.  CONCLUSION

To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.  Summary judgment is appropriate on all of Plaintiff's claims.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [42] for Summary Judgment filed by Defendant MGM Resorts International, Inc., doing business as Beau Rivage Resort and Casino, is **GRANTED**, and Plaintiff Bailie Bye's claims are **DISMISSED WITH PREJUDICE**.  A separate final judgment will enter pursuant to Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 16th day of December, 2021.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE